Good morning, Your Honors. My name is Carter Phillips. I would like to reserve five minutes for rebuttal. All right. Please be aware that the time showing is your total time remaining. Yes, ma'am. I appreciate that. Thank you. Okay. I'd like to begin with the non-disclosure agreement, which I think, candidly, is the fundamental error that the district court committed. And that error completely shifted the entire focus of the proceedings and requires, candidly, a do-over in the circumstances of this case. The battle between the parties was whether or not my clients had used trade secrets or had breached the confidential agreement. And it's undisputed that the trade secrets derived completely from that confidential agreement. The agreement, by its terms, says, provided that this agreement shall terminate on the date two years from the date hereof. That language can only be read, in my estimation, and certainly the only way to read it under English law, is that that supersedes all of the other obligations that the contract provides for. And therefore, after the two-year period had expired, which was August 2013, my clients were free to use all of the information that had been provided by Bladrum in any way that they so chose to use it. May I interrupt, please? Yes, of course, Judge Murphy. I agree that this is the seminal issue in the appeal that we have to decide first. And I understand your argument. To be fair, before the proviso, I think the question is, what I'd like to know, is how we, as an appellate court, have to read this. Because clearly, I would just make the following observations. The introduction of the paragraph indicates that respective obligations under the termination of the discussions for Emerson to purchase Bladrum. We all know, and I think what the district judge attempted to give credit to, is that there would be no point to a paragraph like this if the parties didn't want to keep trade secrets and other confidential information exchanged during the prospective sale secret forever. So, I agree with you 100% that this proviso undermines what appears to be the overall thrust of the paragraph. And I agree that the plain words of the paragraph have to be construed, but the judge below seemed to be wanting to reflect the reality of the parties when they negotiated this paragraph. Agree? Well, there's no doubt that that's what the judge below thought that he was doing in the way he interpreted the contract, but that of course begs the question whether that's the appropriate role for a judge to take when you're talking about interpreting the language of the contract. Says what it says. These are sophisticated parties. This contract was written by Bladrum, so if they had wanted to make it absolutely clear that the obligations with regard to the confidential information that was being imparted would last for, you know, to retain that as confidential would remain in place in perpetuity, it would have been easy enough to do it. And indeed, even in this record, there is the exact same, not exact same, but a comparable agreement between Bladrum and Facebook that in fact does maintain the information in perpetuity. Now, Judge Murphy, I do think there's a narrower answer to your question, which is why would you logically do what they did in this particular instance? And it actually sort of takes two forms. One is, I mean, you would identify, I think, the surviving determination of the discussions and negotiations because that was really the reason the parties came together, right? There was a transaction in mind and they wanted to make sure that even if one or both parties walked away from the transaction, that the obligations would remain in effect for some period of time. And then they identify precisely that period of time, which would be two years. But the other aspect of the case, and I don't know why the district judge didn't give it more credence, is the fact that both parties, or at least certainly Bladrum would have known, and I think Emerson would have been comfortable with it as well, which is from our perspective, all of their real intellectual property was embodied in the patents. They had filed their application for a patent. Those patents were going to be disclosed some months later, but well before the two-year period had run. And there was a serious question once those patents issued as to whether or not there would be anything to protect under the trade secret. So by saying that the whole thing goes away at the end of two years, effectively, I think Bladrum is simply giving up the sleeves off its vest because, as it turns out, when it became public, the trade secret protections would have dissolved in any event. Counsel, is there any evidence to the point that that was the reason why Emerson crafted the agreement the way it did? It certainly makes a reasonable post hoc rationalization, but is there any evidence that that was the intent or on their mind at the time? It's important to remember, your honor, that this is Bladrum who drafted this language. I'm sorry. Yes, Bladrum. Sorry. Yes. And so, no, there's no direct evidence of that. I mean, the only evidence we have from Bladrum, which I think candidly shouldn't have been admitted in any event was the subjective intent of the author of the contract who said it was his view that these would last in perpetuity. But I don't think that's the legitimate way to think about it. I think the question is the way the district judge looked at it. He said it would be sort of commercial irrationality to agree to a two-year. And it seems to me if that's the judge's rationale, then the argument in response is, is that true? Is it a commercial irrationality when you know that the patent is going to be disclosed? And the answer then is no, of course not. It makes perfect commercial sense to draft it the way they did draft it. And given that it's not as though they didn't have access to language that would be comparable to this. Because they had the, they had the Facebook model. They clearly chose this language and presumably chose it for a reason we were comfortable with it. But that's the limit on the constraint on our ability to use the confidential information that Bladrum gave to us. Counsel, under English law was evidence of the subjective intention of the parties admissible to interpret the contract? Oh, your honor, it shouldn't be. If the plain language of the contract, the written agreement states it plainly, the subjective intent of the signers of the agreement and particularly the one-sided subjective intent of the signers is irrelevant and not admissible in court of law. And so that testimony shouldn't have been admitted. I don't think that's ultimately the important question. Mr. Phillips. Because I don't think the court has to go beyond the plain language of the agreement. Mr. Phillips, your, Bladrum argues, it seems to me, that there's really two, if I'm gathering this correctly, there's two separate agreements here. First of all, the confidentiality obligations continue as stated in the first part of the negotiations and agreement itself terminate two years later. I think that's in the opening brief at page 28, roughly. Now that's one way to read the plain language. But if we do, my personal position is that agreement A or sub-A, if you will, and agreement sub-B, if you will, cannot be together. So then does that, under English laws, Judge Rawlinson noted, provide for extrinsic evidence on the intent of the parties? Well, I don't think the premise of the question, Judge Murphy, is correct because I think in this context, the particular language I would focus on actually is the word, are the words in particular. So the second clause is simply giving clarity to the first clause. It's a continuing obligation and it's an obligation that continues in particular, right, even if the negotiations for the underlying transaction to give rise to this agreement should come to an end. They didn't want to just have the parties split. And remember, there are a lot of obligations embedded in here. Most of them are non-disclosure agreements, but there's also poaching of employees. And so it's important to have those obligations continuing even after the negotiations have come to an end. And then the provided for proviso, it seems to me, modifies the entirety of it. And it's important because it's not confident, it's the respective obligations of the parties, which is the opening portion of section 12, and it is in the provided that this agreement shall terminate, meaning all of the respective obligations of the parties should terminate. Did the district court determine that this agreement should be terminated? Well, I don't think so. I think the district court concluded that it would have been irrational, commercially irrational for the party, for Blade Room to enter into an agreement like this, and therefore was unwilling to adopt that construction of it. I think actually the district court found the language plain and said that it supports precisely the position that Emerson put forward, and the judge then just refused to enforce it as written, concluding that the parties would not have undertaken that agreement. And that's not only clearly not an appropriate role for the district court to play in a case, it wouldn't have been an appropriate role for a member of the UK court system to play either. That's just not how contracts, English contracts, are interpreted. They're interpreted by their language, and particularly because Judge Rollinson, even if the judge had decided that it was ambiguous, still true under English law that the ambiguity is construed to the detriment of the party who drafted it. And again, this is Blade Room's language, not Emerson's, and so they're the ones- Is there also a canon in English commercial contract law interpretation that you look to commercial sense? How does that play into this with respect to the plain language? Yeah, you look at the commercial sense, I think, when there's some ambiguity in terms of the understanding of the contract. If the language is not plain, one of the interpretive A's is there, UK law, justice, and US law is the nature of the transaction, and the party's dealings, and a variety of other considerations. But if the language of the contract is clear, then none of that is relevant either as a matter of UK law or US law. So your position is we don't even look to commercial sense or purpose of the contract to interpret that because the language is clear? Yes, that's my number one position, is language is clear and the court ought to interpret it. But if the court wanted to go beyond that and at least draw some comfort from whether this is something that no rational, you know, if your fear was no rational entity would enter into an agreement like this, the reality is that the circumstances here make it perfectly rational for an entity to enter into an agreement just like this because they knew that all of this information was going to be in the public domain in a period of time shorter than two years. And of course, they had certain obligations under this. So for their purposes, they were going to have those obligations ended after two years as well. And it's a bilateral agreement, you know, drafted by Bladrum and therefore, it's... Counselor, if we agreed... Oh, sorry, go ahead. No, no, you go ahead, Judge Bumate. Just quickly, if we agreed with your interpretation, what should happen next? What should we do if we agreed with your interpretation of the contract? Vacate the judgment and remand for a new trial. And candidly, that trial would look vastly different from the trial we had in this particular case. Take off the table. Well, no, no, wait a minute, please. Wait just a minute. We can't just credit your interpretation of the contract and send it back. We could credit your interpretation of the contract, but then we have to figure out whether or not the judge's error precluded Emerson from offering the defense, and then whether or not the defense, if presented, would have made a difference in the trial, right? Well, there is a question of harmless error. Yeah, and we're an appellate court, and this was a 21-day trial with thousands of pieces of documentary evidence and dozens of witnesses. How do you propose we go through and do that? Well, I think the easiest way to look at it is that not getting the nondisclosure agreements obligations correct is the fundamental foundation and building block for the entirety of the trial, because it makes a world of difference whether you're just talking about behavior that ends on August 2013 and the flow of activities. Remember, the damages here come from contracts entered into in 2014, a sale of the division of the company in 2016. That looks very different if you're saying that this all terminates in 2013 than it does if our obligations live on in perpetuity. I don't think there is any way this court could infer from the way this case ultimately was tried and decided that it had anything other than a harmful effect, because we would have had a much, much stronger ability to say there is no causation in this case for the kinds of damages. You're talking about $77 million in damages flowing from, if we're right on the contract, conduct that after 2013 was completely permissible and that we could have relied on and argued that nothing we did prior to the termination of this agreement could possibly have made any difference given that we were free to use all of that information once the nondisclosure agreement had come to an end. So I think under any ordinary, I mean, the burden's on them to show that it's harmless and it seems to me this is such a fundamental problem that there is no way, Judge Murphy, that the court could do anything other than to say it is a harmful error. It should go back for a new trial and that trial should, will candidly look vastly different than the one that the court, than the trial that was held previous to that time. Problem I have is I don't have, I don't see a clock, so I don't know how much time I have. I was going to ask you, did you want to save any time for rebuttal? You had three minutes and 48 seconds. Since I don't see a clock, yes ma'am, I would prefer to save time for rebuttal other than just give me 30 seconds to say one thing and I realize it's sort of cart before the horse, but I do think it's important that even if the court disagreed with me about every other argument, the one argument that is undeniably an error is the prejudgment interest in this particular October 2012 date is not a date that you can use for assigning pretrial interest and it makes a lot of numbers in this case. Seems like the punitive damages are clearly erroneous as well for similar reasons and overstated because of that, correct? Correct, your honor. Thank you. All right, we'll hear from Everson Electric. Who's arguing? I mean, we're here from Bladeroom, I'm sorry, and Ms. Scaff. Thank you, your honor. Good morning. May it please the court, Stephanie Scaff on behalf of the plaintiff Bladeroom. I'll start immediately with the NDA issue because that's the issue that obviously is in front of the court, most primary here. The district court's interpretation of the NDA was correct, but it's in any event, even if that interpretation was erroneous, it did not affect the verdict outcome or the judgment here. I'll start with the interpretation itself. In interpreting a contract, Ingress law looks not only to the words you use, but also to the purpose and the whole of the agreement. Here, the interpretation was not only supported by section 12 of the agreement, but also an objectively reasonable reading of the NDA as a whole. This agreement was about discussions for an acquisition. It was not about giving Emerson rights to use this information to compete with Bladeroom. In fact, that was completely not intended by this agreement. Do we look at the intention of the parties or do we look at the plain language of the agreement? So, your honor, we look at the reasonable, objective intention of the parties entering the agreement. What case from England says that we look at the reasonable intention of the parties? So, it's the objective, reasonable reading of the contract, and that's the chitty, which in England, the chitty on contracts is kind of the basic law of how you review a contract. But the cases talk about the plain reading of the contract. And so, if the plain wording of the contract says one thing, are you saying that we can say a different thing by looking at the objective intent of the parties? The cases support the reading, not just of the specific language of the section, but of the whole contract as a whole. And that's what the English courts look to. And that is consistent in all of the cases, including the cases that Emerson cites. But what language, what other language in the contract would support a reading other than the fact that the NDA terminates in two years? So, paragraph 2B and 2C expressly prevent disclosure of confidential information at any time. And paragraph 2H says that- That's very general language. And in the NDA, there's specific language. So, specific language controls over general language. Yeah. And I would also, yeah, note for the court that there is specific language limiting some obligations. Mr. Phillips referred to the solicitation obligation. That obligation, there's express language saying that ends in 18 months. So, when the parties wanted to end an obligation in a specific time, they knew how to do it. And they did it- That's what the contract says about the non-disclosure, a specific time. No, the non-disclosure agreement is always referred to as at any time. The only thing that says it's terminated is the agreement itself. So, in other words, the first part of section 12 uses the word obligation. The second part of the phrase uses the term agreement. And that's very different than, for example, the Brunel case and the Swiss bank case, where both sections, both the section before the provided then and the section after the provided then, use the exact same language. So, in Brunel- The non-disclosure agreement itself terminated in August of 2013. But the confidentiality obligation, as to any information that was exchanged during the time that the agreement was in effect, that information was required to be kept confidential by Emerson. For how long? I'm not saying that a non-disclosure agreement ended, but it's obligations to keep things quiet persisted. That just doesn't make sense. That's actually very consistent with what the English courts have ruled. And they even rule that as an implied obligation- What English court has ever found a non-disclosure agreement or a confidentiality agreement to end and the information subject to it to be kept secret. That's the personal hygiene case. It's at appendix A47. And I would direct the court specifically to paragraph 36 of that decision. And there the court concludes that even if the NDA language of that agreement was unclear as to the continuing confidentiality obligation, that English law will imply continuing obligation of confidentiality when the party receives the confidential information. But that's in the absence of direct language like you have here, which terminates the agreement. There's no such strong language in that case that you see here. That agreement also terminated and the obligation the court found continued. Again, I think the bigger issue for this court in determining this is that even if the district court's decision on this issue was incorrect, which we don't believe it was, it was very consistent with a reasonable interpretation of this contract. The reality is that the confidentiality obligation, as well as all of the other obligations of this contract, continued until at least August of 2013, even under Emerson's interpretation of this contract. And the evidence was that Emerson repeatedly breached the contract by improperly disclosing and using the information in the period June 2012 to October 2012. And during that time, the agreement was still in effect. So the question for this court is... I thought Emerson's position was that they considered and were aware of the confidentiality, confidential information, but did not use it in any way, shape, or form in this litigation until after August of 2013. Am I wrong about that? Yes, absolutely, Your Honor. Their argument is that they could have used this information after August of 2013 because they had a right to do it then. But that's irrelevant. What they did do and what the evidence showed was that they obtained the information in June of 2012, and then they repeatedly disclosed and used that information over the course of that summer and early fall 2012 to come up with a competing design that they presented to Facebook in October of 2012. Outside of their own company deliberations, they disclosed the information? Absolutely. And not only did they disclose it to Facebook, they also disclosed it outside of the acquisition team. And the contract expressly says that they cannot disclose it only to people with a need to know for purposes of the acquisition. Is this the way the evidence was presented during the trial, though? Absolutely, Your Honor. Absolutely. And that evidence is in our brief, and I can give you the citations to all of that information. It's at page 10 through 16 of our brief, the improper acquisition, disclosure, and use. That's all in 2012, as well as the presentation to Facebook of the stolen design. That's on October 30, 2012. And that was also part of the evidence in front of the court. Was there any evidence of improper use after August 13? So what happened after October 13 was simply the additional consequential damages. In other words, they had already won the contract. They had already replaced, gotten the design in, which all of the witnesses testified that the design was the key. Even Emerson's own witnesses, Mr. Pouchet, the design was the key to them obtaining Lulea instead of Bladerim. And witnesses said the same thing. The only thing that happened after that was they went and they actually signed the formal contract. So it's your position here today that the nondisclosure agreement was breached during the time that the contract was in effect? Absolutely, Your Honor. And so at trial, you didn't rely on any actions taken after the contract terminated. Is that the position you took at trial? That is correct. Our theory was that the contract breach had happened in 2012, that the damage was done on October 30, 2012, when Emerson presented its stolen design to Facebook and received approval for the Lulea project. Counsel, do you want us to go through and make sure that happens? Or would it be better for us to remand to the district court to find out if this was a harmless error? So I think that Your Honors can see that finding in the district court's decisions themselves. So the district court repeatedly references the October 30, 2012 date, not only in connection with the prejudgment interest ruling, but also in connection with its findings of fact in the UCL claim, findings of fact and conclusions of law order, and also in reference to the Rule 50 motion. Well, the difficulty I'm having with that concept is that the district court said it was really difficult to apportion the damages between the nondisclosure agreement and the trade secrets misappropriation. So I'm not sure the district court was as pristine in its reasoning as you are being here today. So the difficulty in apportioning between the trade secret and the contract claim is because the damages between the two were fungible. In other words, the same amounts were of damages flowed from the breach of contract that flowed from the trade secret. That's not true. That's not true. Because some of the damages were profits. Right? So the profits would flow from the breach of the nondisclosure agreement? That's right. That's correct, Your Honor. Under English law, and the district court made this specific ruling at trial on the unjust enrichment under the contract, Emerson has not appealed that ruling to this court. And that was a ruling made by the district court in connection. Well, I think there was appeal and appeal regarding the apportionment of the damages and so for the damages to be apportioned, there would have to be some type of segmenting of what part of the harm is attributable to the nondisclosure agreement breach. And what part of the harm is attributable to the misappropriation of the trade secret? So fairly, again, both the contract and the trade secret misappropriation allowed both for lost profits as well as unjust enrichment. But certain damages are not available for the nondisclosure agreement that would be available for the misappropriation of the trade secrets, like exemplary damages, for instance. So the exemplary damages, right. So in terms of the punitive damages, what the Pasatino case says is that when you have a general damages verdict, like you have here, in other words, it's not split out between the two claims that what the district court has the discretion to award all of the compensatory damages that the jury found, as well as to award punitive damages if the conduct is conduct that supports the punitive damages. Here, the jury made that specific predicate finding on the actual verdict. So the court was correct. In other words, what Pasatino says is that the court not only has discretion to do that award, but it actually has an obligation to make sure that the intent of the jury's verdict is preserved. And here, the intent of the jury's verdict was not only to award compensatory damages, whether that be for contract or for trade secret, but also to by law, exemplary damages are not available for a particular cause of action. The jury cannot award damages for that. The jury can't award it. But again, the trade secret claim here is what carried the punitive damages reward. And the trade secret claim is not affected by the decision on the NDA. But was the award apportioned, though? How do we know how much of the award was based on the trade secrets and how much was based on the NDA? How do we know that? So again, that's the Pasatino decision, 2-12-F-3-493. In that decision, what this court said was that when you're faced with a general damages verdict that does not apportion between claims, that the district court has broad discretion in determining the amount of punitive damages if one of the claims has the right to award punitive damages. And that's exactly the case here. And again, the court went on to say that not only does it have that discretion, it has the obligation to do that because that's what the jury was instructed on punitive damages for willful and malicious misappropriation. Could you cite this in your brief? This was in the supplemental submission that we submitted to the court. We submitted two cases. One was Pasatino, which had to do with general... When was that case decided? That case was decided by the Ninth Circuit in 2000. Why was it a supplemental? If that's pivotal to your argument, why was it done in a supplemental brief as opposed to in your main brief? Because that decision... So we took the position in our brief that the review was for abuse of discretion. And when Emerson replied, they said, no, it's de novo because it's an issue of law of whether or not the court could do this. And that's what Pasatino was referring to. And they also argued that somehow the discretion in the reply brief, that the discretion that the court exercised in the punitive damages context somehow conflicted with what the district court judge did in the offset context. And that is also not correct. The district court had the discretion to act on the jury's verdict and to preserve what that verdict intended, which was both compensatory damages and because of the malicious finding, a punitive damages award. In the offset context, the burden was on Emerson to prove a right to an offset. And in that context... Can I interrupt briefly because my recollection of one of the court had determined in its order denying the motion to compel the Facebook settlement, that it couldn't apportion the misappropriation of the NDA damages. So it would seem that Judge Rawlinson is right that the court had made that decision well before it got to the point of the jury verdict. That actually, that decision came after the jury award. So that came after, that was one of the last motions that the court ruled on. And that decision, what the judge said is that you can't tell from the verdict what amount was awarded. And that is correct. Plaintiff, we actually asked for a differentiated verdict that would have allowed that difference. And Emerson objected to that and proposed one that was general, which the court ended up giving along with the deduplication instruction. The difference is the procedural context. So in the punitive damages context, what the Pasatino case says is that there, the court had discretion to look beyond the verdict to the evidence to see whether the evidence supported the award on either of the claims. And if so, if it supported the punitive damages, if there was a finding and there was here on the verdict of malicious conduct, that it should go on to award punitive damages. Counsel, what's the citation for the Pasatino case? It's 212 F 3rd 493. Okay. In the offset context by contrast, as the district court correctly found, it was Emerson's burden to show a right to offset from the award. The jury's verdict indicates no intent to give Emerson an offset. And in fact, the offset statute is really this quid pro quo, right? The Emerson's obligations of contribution to a settling defendant here, Facebook are extinguished. And in turn, Emerson gets an offset. There has been no good faith order of motion by Facebook. There never was. There's Emerson's rights to contribution have never been extinguished. And they, what the Conrad case does, and that's the other case that we submitted in our supplement, it says the same thing that the district court's case, the text wrong case that the district court relied on says, which is that it's Emerson's burden to show a right to offset from the award. But Conrad actually goes one step further and says, not only is it it's burden, but when a party doesn't propose a differentiated verdict that allows the court to determine between the two to claim the offset. And here, that's exactly what happened. The tort claim carried a right to offset. The contract claim did not. And Emerson proposed a verdict that didn't differentiate between the two. And basically what Emerson is trying to do is hold that this general verdict against Bladerim in the punitive damages context, where we actually asked for it to be separated and also to take advantage of it in the offset context. But that's because that was the way the court phrased the instructions. So I'm on the Pasatino case, and this is a Title VII case. And the claims, the court, we noted that the claims were basically the same. So the reasoning that you gave us regarding this case doesn't apply when the claims are different, because in this case, the punitive damages could be tacked on to either of the claims because they were the same. And so apportionment was not necessary. We don't have that here. The claims are not the same in this case. In Pasatino, actually, only one of the claims had a right to punitive damages. The other one, the state law claim, did not. Right. So we said the claims were essentially the same. They were both discrimination claims, one under federal law, one under state law. So it didn't matter whether or not it was apportioned because basically it was the same wrong. We don't have that here. We have two different claims. They're not the same claim. So the reasoning in Pasatino does not transfer to two different claims. So the conduct here that it was exactly the same conduct that underlies. But it wasn't the same claim. And that's what we said in Pasatino. It's the exact same claim, one under the federal law and one under the state analog. We don't have that here. We don't have a trade secrets claim under federal law and under state law or a non-disclosure agreement under federal law and state law. We have two distinct and separate claims here. I think that's correct, what you've said, Judge Rawlinson. I would just whether or not the damages between the two claims were effectively fungible. That was what the court looked at. It looked at whether or not the claims were the same. And it also looked at whether the claims were the same and the conduct was the same. Emerson suggests that there is different conduct here, but that's actually not correct. The conduct is exactly the same. The only difference is that under the contract, it was a breach of contract of a confidentiality obligation when they used and disclosed the trade secret information. And under the trade secret law, it was a improper use and disclosure of trade secrets. The conduct, the breach is complete when the trade secret is disclosed, but the misappropriation is not complete until they actually use the information. So it's not the exact same conduct. So the trade secret statute provides for two separate types of misappropriation. One is use and one is misappropriation. One is disclosure. You don't need both of those. Either are sufficient to support a trade secret. That's not how this case was tried though. Well, both happened here and the district court in its rule 50 order specifically ruled that the disclosure was sufficient to support the trade secrets, the trade secret verdict. And the evidence was that that is exactly what happened, that they both disclosed and used. So they disclosed the information in a way that they were not permitted to, including by disclosing it to their design and engineering team who was competing with Blabroom. And they also used and disclosing it to Facebook. They met repeatedly with Facebook over three months disclosing and using the information to try to come up with their copycat design. And then ultimately they again disclosed the final version of it in their presentation. Would you object to a remand for the district court to sort all this out? Because the district court sat through the trial and would be in a much better position to make this determination than we are. On the punitive damages issue? On the allocation, on whether or not the, if any error was harmless on the NDA. Would you object to us remanding that to the district court for a fresh look if we determine that the non-disclosure agreement was, ruling was error? I think that you're, I think your honor that that is, is something that can be done. I would just say that the district court did make these rulings, particularly on the, the allocation of the damages in its actual decision. That was, well, it didn't make the ruling in the context of if we decide that the ruling on the non-disclosure agreement was error, then the district court could decide whether or not it was harmless error or what relief, if any, should be granted. That, that's correct, your honor. I think that, that the district court could do that. And I'm confident that the district court would do it in a way that was consistent. All right. Thank you. Rebuttal. Thank you, your honors. I'll try to be brief. First of all, with respect to the, to the contract as a whole, Chitty is, is quite clear how you read these agreements. You asked the question about whether or not subjective intent can count and Chitty on page 1040, section 13-048, it says courts are not concerned to identify the subjective understandings of the parties to the contract or the meaning which they subjectively ascribe to the term and dispute of such evidence is therefore inadmissible. If you look at. Unless there's certain circumstances, which I frankly don't think we have here. You, I mean, there has to be special reasons. Chitty would allow you to I think it's important, even if it's beyond section 12, but even in section 2a, which is really the primary basis on which they make, you'll notice that that one doesn't say that the obligation runs forever. It doesn't have any time limitation at all. So for the use of the information, 2a would undeniably take you to section 12 and that invariant, you know, without question then ends up being that it ends in August of 2013. What about all these allegations of breach during the period prior to August of 13? I didn't get the sense that Emerson was willy-nilly breaching the nondisclosure agreement, even before it's termed expiration. Well, obviously our view of the world is that we didn't, but they certainly put, there's no question they put on evidence that there was some potential use of that information as we were, as we were, as we were preparing our designs. I don't, I don't dispute that, but I do dispute that my friend argued is that somehow everything in their evidence stopped in August of 2013. The reality is that all of the damages flow from conduct that took place after 2013. There is a lot of discussion in the record post 2013, August, 2013. It talks about marketing materials that our client, my clients use. There are, there are other projects where we allegedly used it, but all post date that, and all of that evidence was free for the jury to consider because the jury was not told that we are free to go forward. And that takes me, Judge Rawlinson, to your question as to who should decide this. And the answer is you should decide as a matter of law today that this is not harmless error. This, this is a fundamental predicate to how this entire case is considered. And if you don't have the NDA right, the rest of the case cannot be just re, you can't unscramble the egg at that, at that point in time. With respect to punitives versus the punitive damages as they arise out of the trade secret versus the breach of contract, there is no way to reconcile the jury's verdict, specifically saying that the trade secret nine, punitive trade secret nine, is not in fact a trade secret, but was in fact used. That's, that's a contract claim. And so obviously the jury saw a difference between the contract and the trade secrets and therefore not having any idea how much of the money was attributed through the trade secrets means that that part of the verdict has to be set aside. Judge Rawlinson, you distinguish the case that they cite in the 20J, 28J letter, uh, candidly better than I could. And so, as I say, it seems to me that this is not an issue that you, that you remand to the this is one where the presumption is on them to demonstrate that it was harmless. They cannot meet that burden in a case that was tried the way this case was tried and where all of the damages flow from behavior, from, from actions, ultimately taking two and four years after this agreement is terminated. So therefore you should vacate and remand for a new trial on the discernment But no further questions. I appreciate it. It appears not. Thank you. Thank you to both counsels for your helpful arguments. The case just argued is submitted for decision by the court.
judges: Rawlinson, Murphy, Bumatay